# In the United States Court of Federal Claims

No. 10-599 C

(E-Filed: November 1, 2010)[1]

| | | |
|---|---|---|
| PYRAMID REAL ESTATE SERVICES, LLC, Plaintiff, | ) | Post-Award Bid Protest; Challenges to Evaluation of Price and Technical Factors |
| v. | ) | |
| THE UNITED STATES, Defendant, | ) | |
| and | ) | |
| MATT MARTIN REAL ESTATE MANAGEMENT, LLC, Defendant-Intervenor, | ) | |
| and | ) | |
| HOMETELOS, LP, Defendant-Intervenor. | ) | |

[1]This Opinion was filed under seal on October 14, 2010. The court directed that, if any party believed that the October 14, 2010 Opinion contained protected material that should be redacted before publication, that party would, by motion filed on or before October 25, 2010, request that such protected material be redacted. Now before the court are Plaintiff's Motion to Redact Protected Material from Sealed Opinion, Docket Number (Dkt. No.) 55, filed October 25, 2010; Defendant's Notice of Filing of Proposed Redacted Document, Dkt. No. 56, filed October 25, 2010; and Intervenor HomeTelos's Motion to Redact Protected Material From Sealed Opinion, Dkt. No. 57, filed October 25, 2010 (collectively Motions to Redact). The court now GRANTS the Motions to Redact. Redactions are indicated by [***].



Janine S. Benton, Falls Church, VA, for plaintiff; John M. Murdock, Kathy C. Potter and Rosanne E. Staffiej, Falls Church, VA, of counsel.

Tara K. Hogan, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director and Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant; Patrick Simien, Office of the General Counsel, Department of Housing and Urban Development, Washington, DC, of counsel.

Laurence Schor, Washington, DC, for defendant-intervenor Matt Martin Real Estate Management, LLC; Susan L. Schor and Dennis C. Ehlers, Washington, DC, of counsel.

J. Alex Ward, Washington, DC, for defendant-intervenor HomeTelos, LP; Leslie H. Lepow, Eric R. Haren and Damien C. Specht, Washington, DC, of counsel.

OPINION

HEWITT, Chief Judge

This is a post-award bid protest brought by Pyramid Real Estate Services, LLC, (Pyramid or plaintiff), an unsuccessful offeror in Solicitation R-OPC-23441 (Solicitation) issued by the United States government acting through the United States Department of Housing and Urban Development (HUD, the government or defendant).

Before the court are plaintiff's Motion for Preliminary Injunction, Docket Number (Dkt. No.) 3;[2] plaintiff's Memorandum in Support of Plaintiff's Motion for Preliminary Injunction and Application for Temporary Restraining Order, Dkt. No. 4; plaintiff's amended Memorandum in Support of Plaintiff's Motion for Preliminary Injunction and Application for a Temporary Restraining Order, Dkt. No. 11; Memorandum in Support of Plaintiff's Motion for Judgment on the Administrative Record, Dkt. No. 24; Plaintiff's Statement of Facts in Support of Its Motion for Judgment on the Administrative Record, Dkt. No. 25; plaintiff's Corrected Memorandum in Support of Plaintiff's Motion for Judgment on the Administrative Record (Plaintiff's Motion or Pl.'s Mot.), Dkt. No. 29; Defendant's Motion for Judgment Upon the Administrative Record and Response to Plaintiff's Motion for Judgment on the Administrative Record (Defendant's Motion or Def.'s Mot.), Dkt. No. 33; Intervenor HomeTelos's Cross-Motion for Judgment on the

[2]Plaintiff's Application for Temporary Restraining Order, filed on September 9, 2010, Docket Number (Dkt. No.) 2, was denied by the court in its order of September 13, 2010, Dkt. No. 15.

Administrative Record (HomeTelos's Motion or HomeTelos's Mot.), Dkt. No. 34; Matt Martin Real Estate Management LLC's Opposition to Pyramid Real Estate Services, Inc.'s Motion for Judgment on the Administrative Record and Cross-Motion for Judgment on the Administrative Record, Dkt. No. 35; Plaintiff's Consolidated Reply and Response (Plaintiff's Reply or Pl.'s Reply), Dkt. No. 38; defendant's reply to Plaintiff's Response (Defendant's Reply or Def.'s Reply), inadvertently filed as Defendant's Motion to Dismiss Plaintiff's Complaint for Lack of Jurisdiction, Dkt. No. 41; Intervenor HomeTelos's Reply in Support of its Cross-Motion for Judgment on the Administrative Record, Dkt. No. 43; and Matt Martin Real Estate Management LLC's Reply to Plaintiff's Consolidated Reply and Response, and Response to HomeTelos, LP's Cross-Motion for Judgment on the Administrative Record, Dkt. No. 45.

## I. Background

### A. The Solicitation

#### 1. The Role of Asset Managers

The Department of Housing and Urban Development (HUD), acting through the Federal Housing Administration (FHA), runs a homeownership program called the single-family mortgage insurance program, which insures lenders against the risk of loss for loans on single-family homes. Administrative Record (AR) Tab 13, at 405. When borrowers default on their loans, lenders often acquire the property by foreclosure or by deed-in-lieu of foreclosure. Id. Lenders insured by the single-family mortgage insurance program then file a claim for benefits from HUD and convey the property to HUD. Id.

As a result of this program and others, HUD has a large inventory of properties, known as Real Estate Owned (REO) properties, to manage and sell. Id. Since 1999, HUD has relied on outsourcing to Management and Marketing (M&M) vendors, who help to manage and market its REO portfolio. Id. In the past, HUD contracted with single entities to both manage and market its REO properties but, after conducting marketing research of "industry best practices," it decided to split the responsibilities of M&M vendors and begin contracting with Asset Managers (AMs), companies which focus on marketing HUD properties. Id.

On July 6, 2009 HUD issued its Solicitation for AMs. AR Tab 13, at 358. The Solicitation was a "Firm Fixed Price type arrangement with multiple awards [to be] issued against the General Service Administration (GSA) Financial and Business Solution (FABS) Schedule 520, in accordance with Federal Acquisition Regulations (FAR) Subpart 8.4 Federal Supply Schedule."[3] Id. at 360. HUD invited vendors to submit bids for one or more of ten geographic Homeownership Center Areas (HCAs or Areas). Id.

---

[3]HUD determined that the primary objectives of Asset Managers were to ensure that:

2. Evaluation Framework

The Solicitation instructed bidders to submit a "Technical Proposal" and a "Price Proposal." AR Tab 13, at 510. To "provide a basis for sound evaluation by the Government," the Technical Proposals were to contain four main sections: (1) Socio-Economic Evaluation, (2) Marketing and Sales Approach, (3) Management Work Plan and (4) Past Performance. Id. at 511-13.

The Solicitation states that Price Proposals were to cover a number of contract line items (CLINs), id. at 514, for the base year and for each of four option years. Id. at 514. The first two CLINs were to contain bidders' marketing fees for non-Asset Control Area[4] (non-ACA) properties, expressed as a percentage of the Net Offer amount for the properties. Id. at 360-61 The third CLIN was to contain the marketing fee for Asset Control Area (ACA) properties. Id.

Bidders were directed to submit supporting documentation with their Price Proposals, which the Solicitation stated "shall include showing the labor mix breakdown (e.g. contract labor categories, labor rate, estimated hours for each labor category per CLIN per year) used to develop the proposed fixed unit price/rate proposed." Id. at 514.

The Solicitation stated that HUD would reimburse vendors for three categories of pass-through expenses:

> Appraisal Fee - the actual cost (up to a maximum of $350) for the first appraisals (used to determine list price). HUD will not reimburse for 2nd or updated appraisals.
>
> Record Retention, Exit File Delivery - the actual cost of shipping files and for the boxes for record will be reimbursed by HUD.

---

1. Properties are accurately and competitively valued.
2. Sales achieve the highest return.
3. Holding time is minimized.
4. Sales create owner-occupant opportunities.
5. Closing proceeds are properly accounted for and delivered to HUD in a timely manner.

Administrative Record (AR) Tab 13, at 409.

[4]The Solicitation defines the Asset Control Area (ACA) Program as "a program for the disposition to eligible participants of HUD-owned properties and future HUD acquisitions of properties and/or mortgage loans located within HUD designated revitalization areas." AR Tab 13, at 411.

> Post Closing Complaints - actual amounts paid by the Vendor to resolve post-closing complaints when approved in advance by the [Government Technical Representative (GTR)].

Id. at 362.

The Solicitation listed five factors that would be used to evaluate proposals. In descending order of importance, they were:

- FACTOR 1: Socio-Economic [S]tatus
- FACTOR 2: Marketing and Sales Approach
- FACTOR 3: Management Work Plan
- FACTOR 4: Past Performance
- FACTOR 5: Price

Id. at 516. The Solicitation stated that "[t]he non-price factors when combined are more important than price." Id.

The Socio-Economic Factor was to be evaluated as follows:

> Socio-Economic Status of the Vendor shall be considered as a primary evaluation factor for award with the goal of achieving one of the Agency's socio-economic goals to increase small business participation as prime contractors. HUD is strongly committed to ensuring that small businesses, veteran-owned small businesses, service-disabled veteran-owned small businesses, HUB Zone small businesses, disadvantaged businesses, women-owned and 8a small businesses[5] have maximum opportunities to participate as prime contractors. For vendors proposing GSA Schedule Contractor Teaming Arrangements (CTAs), the vendor shall specify the allocation taking into consideration the appropriate weight based on their planned performance of each Team member will be used [sic]. For 90% to 100% of the work being performed by [small businesses], the offeror will receive a rating of Excellent. For 70% to 89% of the work being performed by [small businesses], the offeror will receive a rating of Very Good. For 51% to 69% of the work being performed by [small businesses], the offeror will receive a rating of Good. For 50% or less of the work being performed by [small businesses], the offeror will receive a rating of Fair.

Id. The Solicitation stated that the GSA eLibrary would be used to determine each vendor's socio-economic status. Id. at 511.

[5]For convenience, the court refers to the listed categories of small businesses collectively as small businesses.

The Solicitation stated that "a best value analysis will be performed to determine the best overall value for the Government within each Homeownership Center Geographic Area . . . ." Id. at 520. While price was to be the least important factor, "as the Offerors become more equal in non-price merit, the importance of price to the source selection decision will increase." Id.

B. Discussion Letters and Revised Proposals

Pyramid submitted a proposal for HCA 2D.[6] See AR Tab 51. Pyramid's proposal was reviewed by a selection team composed of a five-member Technical Evaluation Team (TET) and a Source Selection Official (SSO). See AR Tab 10, at 308. The TET prepared an initial summary report evaluating each vendor's proposal. See AR Tab 38. The TET rated Pyramid's Technical Proposal as follows:

FACTOR 1: Socio-Economic Status - [***]
FACTOR 2: Marketing and Sales Approach - [***]
FACTOR 3: Management Work Plan - [***]
FACTOR 4: Past performance - [***]

AR Tab 38, at 2139-2153.

Pyramid's proposal stated that, "[o]f the work to be completed under this procurement, Pyramid intends to [***]." AR Tab 51, at 8183. [***]. Id. at 8178-8242; Oral Argument of October 7, 2010, Argument of Mr. Murdock, 2:30:40-45.

[***] AR Tab 38, at 2139; see also AR Tab 51, at 8183 (Pyramid's Technical Proposal) (stating that "Pyramid's socio-economic status is a [***]").

The TET then addressed Pyramid's Price Proposal. The TET determined that Pyramid had "offer[ed] a total price[7] of [***], an average price of [***]." AR Tab 38, at 2154. Pyramid's price exceeded the Independent Government Cost Estimate (IGCE) by approximately [***] per property. Id. Based on the fact that Pyramid had not submitted the information requested in the Solicitation about its labor mix breakdown and the fact that Pyramid's price exceeded the IGCE, the TET stated that Pyramid's price "[***]." Id.

The TET sent discussion letters, dated April 23, 2010, to the bidders. See AR Tab 22. The letter the TET sent to Pyramid requested a revised proposal with additional

---

[6]Area 2D includes southern Texas, Kansas, Missouri, Arkansas, Louisiana and Oklahoma. AR Tab 14, at 524.

[7]By "price," the Technical Evaluation Team referred to Pyramid Real Estate Services, LLC's (Pyramid's) marketing fee. It excluded the other Contract Line Items (CLINs).

information. AR Tab 22, at 926. The discussion letter listed "findings" on several areas of the proposal that contained weaknesses or required additional explanation. Id. at 929-32.

Two of the TET's findings are relevant to Pyramid's protest. The first relates to property inspections. The Solicitation requires that bidders agree to perform three inspections: an initial inspection, a "prior-to-list" inspection and a "ready-to-close" inspection, as well as any "GTR-directed inspections."[8] AR Tab 13, at 433-34. Pyramid planned to [***] to perform the ready-to-close inspections, [***]. AR Tab 22, at 929. The discussion letter stated that [***] is not in compliance with the AM requirement as the PWS [Performance Work Statement] requires [***]. Further, it would not be appropriate for the [***]." Id.

The second finding was related to Pyramid's Price Proposal. "The marketing fee of [***] is considered high." Id. at 932. Further, "[***]." Id. The letter requested that Pyramid: "1. Provide rationale for a marketing fee of [***] 2. Clarify inconsistencies, and provide revisions, to include rates and number of hours, as appropriate." Id.

C. Evaluation of Final Proposals and the Award Decision

Pyramid submitted a revised proposal. See AR Tab 51, at 8243-8316. Responding to HUD's concern about [***], Pyramid responded:

> While this inspection is best performed [***], Pyramid will [***] to complete this inspection. . . . [***]

Id. at 8304-05.

The revised proposal reduced Pyramid's marketing fee to from [***] to [***]. Id. at 8310. The revised proposal did not contain the labor mix breakdown requested in the Solicitation, but stated that "Pyramid did not submit rates and hours for all [***] employees listed in the bid as [***] was already in the format HUD requested for CLINs 2D01, 2D02 and 2D03 previously approved by the GSA." Id.

The TET conducted a second review, focusing on the modifications bidders had made to their proposals. AR Tab 37, at 1469. The TET noted that Pyramid had "removed [***] The Vendor's revised proposal included [***] unnecessarily increases the number of personnel." Id. at 1651. The TET lowered Pyramid's rating for Factor 2.1 - Usage of Local Real Estate Professionals from "[***]" to "[***]." Compare AR Tab 38, at 2139 ("[***]"), with AR Tab 37, at 1451 ("[***]"). The TET lowered Pyramid's overall rating for Factor 2, Sales and Marketing Approach, from "[***]" to "[***]." Compare AR Tab 38, at 2139 ("[***]"), with AR Tab 36, at 1448 ("[***]").

---

[8]Asset Control Area properties were excluded from the requirement to perform initial and "prior-to-list" inspections. AR Tab 13, at 434.

The TET lowered Pyramid's rating for Factor 3 - Management Work Plan from "[***]" to "[***]." Compare AR Tab 38, at 2147 ("[***]"), with AR Tab 37, at 1655 ("[***]").

The TET gave Pyramid's revised Technical Proposal an overall technical rating of "[***]." AR Tab 37, at 1655.

The TET found that Pyramid did not clarify inconsistencies in its pricing or provide the "rates and number of hours for each labor category (approximately [***] positions)." Id. at 1656. The TET noted that Pyramid's adjusted marketing fee of [***] "is still high." Id.

On May 21, 2010 the TET summarized the results of its evaluation in a Source Selection Recommendation (Recommendation) to the SSO. AR Tab 36, at 1447-48. Pyramid's ratings were listed as:

FACTOR 1: Socio-Economic Status - [***]
FACTOR 2: Marketing and Sales Approach - [***]
FACTOR 3: Management Work Plan - [***]
FACTOR 4: Past performance - [***]

Id. at 1448. The TET listed Pyramid's Overall Technical Rating as "[***]." In all, the TET wrote that [***] proposals, including Pyramid's were of "'[***]' quality." Id. at 1456. The TET did not recommend Pyramid for award, noting that:

> Although they had a "[***]" technical proposal, their price was the [***] of all the technically acceptable proposals. Also, their price was [***] above the IGCE. Moreover, the recommended proposals for award [***].

Id. On May 25, 2010 the SSO issued a Source Selection Decision Document, accepting the TET's recommendations. AR Tab 35, at 1445-46. The three Asset Managers chosen for awards were Pemco, Ltd. (Pemco), Matt Martin Real Estate Management, LLC (Matt Martin) and HomeTelos, LP (HomeTelos). AR Tab 35, at 1445. Pyramid was not chosen for an award. Id.

On September 9, 2010 Pyramid filed suit in the United States Court of Federal Claims, requesting a declaration that the awards in HCA 2D were issued contrary to the applicable procurement laws and regulations, a temporary restraining order (TRO), a preliminary injunction and a permanent injunction against performance of the work Pyramid had bid on. The court, by its order of September 13, 2010 (Order of September 13, 2010), Dkt. No. 15, denied Pyramid's motion for a TRO and consolidated proceedings to address plaintiff's motions for a preliminary injunction and a permanent injunction under an expedited briefing schedule.

Pursuant to the expedited briefing schedule, the government filed the AR, Pyramid filed a motion for judgment on the administrative record under Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC), and defendant and defendant-intervenors filed cross-motions for judgment on the administrative record.

The court held oral argument at the National Courts Building on Thursday, October 7, 2010 at 2:00 p.m. Eastern Daylight Time.[9] See Order of September 13, 2010.

II. Legal Standards

A. Bid Protest Standard of Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act (ADRA), 28 U.S.C. § 1491(b)(1) (2006), confers jurisdiction on this court

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1). The court reviews a bid protest action under the standards set out in the Administrative Procedure Act (APA), 5 U.S.C. § 706 (2006). 28 U.S.C. § 1491(b)(4); NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004). The APA provides that an agency's decision is to be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Bannum, Inc. v. United States (Bannum), 404 F.3d 1346, 1351 (Fed. Cir. 2005); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1329 (Fed. Cir. 2004); Impresa Construzioni Geom. Domenico Garufi v. United States (Impresa), 238 F.3d 1324, 1332 (Fed. Cir. 2001); Advanced Data Concepts, Inc. v. United States (Advanced Data Concepts), 216 F.3d 1054, 1057 (Fed. Cir. 2000).

Under the arbitrary or capricious standard of review, an agency's decision must be sustained if it has a rational basis. Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co. (State Farm), 463 U.S. 29, 43 (1983). "The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, 216 F.3d at 1058 (citing Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc. (Bowman), 419 U.S. 281, 285 (1974)). In

[9] The oral argument held on Thursday, October 7, 2010 was recorded by the court's Electronic Digital Recording (EDR) system. The times noted in citations to the oral argument refer to the EDR record of the oral argument.

particular, the reviewing court may not substitute its judgment for that of the agency. Citizens to Preserve Overton Park, Inc. v. Volpe (Overton Park), 401 U.S. 402, 416 (1971), abrogated in part by Califano v. Sanders, 430 U.S. 99, 105 (1977) (abrogating Overton Park by recognizing that the APA is an independent grant of subject-matter jurisdiction).

Under the APA standard of review, as applied in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and now under the ADRA, "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Impresa, 238 F.3d at 1332. Challenges to decisions on the basis of a violation of a regulation or procedure "must show a clear and prejudicial violation of applicable statutes or regulations." Id. at 1333 (internal quotation and citation omitted).

In order to prevail in a bid protest, a "protester must show not only a significant error in the procurement process, but also that the error prejudiced [the protestor]." Data Gen. Corp. v. Johnson (Data Gen.), 78 F.3d 1556, 1562 (Fed. Cir. 1996); see also Alfa Laval Separation, Inc. v. United States (Alfa Laval), 175 F.3d 1365, 1367 (Fed. Cir. 1999). If the court finds that there is no error, there is no prejudice and the government's decisions must be left undisturbed. Alfa Laval, 175 F.3d at 1367 (requiring that a protestor establish "significant, prejudicial error" to prevail in a bid protest). The first step is to demonstrate error; to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law. Bannum, 404 F.3d at 1351. The next step is to determine whether the error was prejudicial. Id. "[N]on-prejudicial errors in a bid process do not automatically invalidate a procurement." Labatt Food Servs. v. United States (Labatt), 577 F.3d 1375, 1380 (Fed. Cir. 2009) (citing Data Gen., 78 F.3d at 1562). The plaintiff must demonstrate both that an error occurred and that such error was prejudicial. Data Gen., 78 F.3d at 1562. In the context of a post-award bid protest, "the plaintiff must demonstrate 'substantial prejudice' by showing that there was a 'substantial chance' it would have been awarded the contract but for the agency's error." Weeks Marine, Inc. v. United States, 79 Fed. Cl. 22, 35 (2007) (internal citation omitted), aff'd in relevant part, 575 F.3d 1352 (Fed. Cir. 2009).

### B. Motions for Judgment on the Administrative Record

RCFC 52.1 provides for judgment on the administrative record "[w]hen proceedings before an agency are relevant to a decision in a case" before the court. RCFC 52.1(a). RCFC 52.1 does not address the standards and criteria to be applied in cases decided pursuant to RCFC 52.1 because "[t]he standards and criteria governing the court's review of agency decisions vary depending upon the specific law to be applied in particular cases." RCFC 52.1 rules committee note (2006). Accordingly, the standards of review and burdens of proof and persuasion are set by the terms of the applicable

substantive law, including, in this case, statutory and case law discussed above in Part II.A.

A court reviewing an agency action in a best value procurement must be highly deferential, and the agency that made the determination in question is presumed to have acted in a reasonable and rational manner. Advanced Data Concepts, 216 F.3d at 1058; Fort Carson Support Servs. v. United States (Fort Carson), 71 Fed. Cl. 571, 586 (2006). A plaintiff must rebut the presumption of a rational basis in order to upset the agency's findings. L-3 Commc'ns EOTech, Inc. v. United States, (L-3 Commc'ns), 87 Fed. Cl. 656, 664 (2009); see Advanced Data Concepts, 216 F.3d at 1058 ("[[T]he arbitrary and capricious] standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.") (internal quotation marks omitted). In determining whether an agency acted rationally, the court is particularly deferential to the agency's technical evaluation. L-3 Commc'ns, 87 Fed. Cl. at 664. "In particular, the evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations." Fort Carson, 71 Fed. Cl. at 586 (citations omitted).

"Contracting officers are not obligated by the APA to provide written explanations for their actions." Impresa, 238 F.3d at 1337. Moreover, agency actions are entitled to a presumption of "regularity." Id. at 1338. There is a "strong presumption that government officials act correctly, honestly, and in good faith when considering bids . . . ." Savantage Fin. Servs., Inc. v. United States, 86 Fed. Cl. 700, 703-04 (2009).

The court will not second-guess the ratings given by procurement officials that involve discretionary determinations. E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996). The question for the court is not whether the agency is correct or whether the court would have reached the same conclusion as the agency did, but whether there was a reasonable basis for the agency's actions. Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) ("If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.") (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).

## III. Discussion

### A. HUD's Evaluation of Pyramid's Price

#### 1. Labor Mix Breakdown

The Solicitation required that all bidders provide supplemental documentation to support their Price Proposals. "In addition, supporting documentation shall include showing the labor mix breakdown (e.g. contract labor categories, labor rate, estimated hours for each labor category per CLIN per year) used to develop the proposed fixed unit price/rate proposed." AR Tab 13, at 514.

Pyramid contends that, because offers were accepted only from "GSA Schedule contract holders on Schedule 520," GSA had "already determined the prices offered by each offeror [were] 'fair and reasonable.'" Pl.'s Mot. 13. Therefore, "there is no rational basis for HUD's insistence that offerors 'make up' labor rates and overhead costs so that HUD could determine if the GSA Schedule price, and offered discounts, [were] reasonable." Id. at 14.

As an initial matter, the court notes that Pyramid waived this argument by not raising it before the award was made. "[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313 (Fed. Cir. 2007).[10] As the United States Court of Appeals for the Federal Circuit explained:

> It would be inefficient and costly to authorize this remedy after offerors and the agency had expended considerable time and effort submitting or evaluating proposals in response to a defective solicitation. Vendors cannot

[10]Pyramid has contradicted itself at several points as to precisely what HUD did incorrectly regarding the labor mix information. At oral argument, Pyramid conceded that HUD could lawfully request labor mix information in the Solicitation, but that vendors could not lawfully provide it, and that HUD could not use the information once it was provided. Oral Argument of October 7, 2010, Argument of Mr. Murdock, 2:10:00-30 ("You can ask for it, but if the offerors don't have it--if it's not part of the GSA Schedule and you're ordering off the GSA Schedule--they can't make it up. And if they do make it up, the government can't rely on it."); see also Pl.'s Mot. 14 ("Although HUD could request documentation as to the basis of each offered price, offerors could not provide information to HUD that was not negotiated or authorized by GSA, and HUD was limited to evaluating only whether the total price [was] reasonable.") (emphasis removed); but see Pl.'s Mot. 14 ("Accordingly, there is no rational basis for HUD's insistence that offerors 'make up' labor rates and overhead costs . . . ."); and Pl.'s Reply 8 (arguing that Pyramid was prejudiced "Despite HUD's argument that the hundreds of requests for labor rates in the record amount to 'harmless error'" . . . .). If Pyramid objected to the request for labor mix information in the Solicitation or HUD's plan to use labor mix information to evaluate proposals, the time to bring a challenge was before the award was made. "Vendors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award [sic] and then, if unsuccessful, claim the solicitation was infirm." Blue & Gold Fleet, L.P. v. United States (Blue & Gold), 492 F.3d 1308, 1314 (Fed. Cir. 2007) (quoting Argencord Mach. & Equip., Inc. v. United States, 68 Fed. Cl. 167, 175 n. 14 (2005)).

> sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award [sic] and then, if unsuccessful, claim the solicitation was infirm.

Id. at 1314 (quoting Argencord Mach. & Equip., Inc. v. United States, 68 Fed. Cl. 167, 175 n. 14 (2005)).[11]

Furthermore, Pyramid has not established how the use of labor mix information, if unlawful, prejudiced Pyramid.[12] To challenge the procurement, Pyramid "must show a clear and prejudicial violation of applicable statutes or regulations." Impresa, 238 F.3d at 1333 (internal quotation and citation omitted). "Non-prejudicial errors in a bid process do not automatically invalidate a procurement." Labatt, 577 F.3d at 1380. Pyramid claims that, as a result of its refusal to provide a labor mix breakdown, it was "downgraded on pricing." Pl.'s Mot. 10. However, price was not rated on the adjectival scale used for the technical factors, which ran from "Poor" to "Excellent." AR Tab 10, at 311. Rather, in its Recommendation, the TET recommended the three lowest-priced bidders in area 2D that had received overall technical ratings of "[***]." See AR Tab 36, at 1456. Explaining why it had not chosen Pyramid, the TET wrote, "The recommended proposals for award had [***] technical proposals with lower prices." Id. Plaintiff's labor mix was not even mentioned in the Recommendation. See id. It is clear from the record that the labor mix information was requested by HUD to help the agency evaluate the prices bidders submitted. Even though Pyramid did not submit the requested information, it was still considered for an award. Its price was simply too high compared to the bidders with equal technical evaluations.

2. Pass-Through Expenses

The Solicitation specified three categories of pass-through expenses--appraisal fees, record retention, and post-closing complaints--for which HUD would reimburse vendors in

---

[11]Pyramid makes a number of arguments about HUD's request for this information, including that the request was prohibited by the Federal Acquisition Regulation, Pl.'s Mot. 13-14, and that "HUD changed the terms and conditions of [another bidder's] GSA Schedule contract" by considering the labor mix information it provided. Id. at 16. Pyramid also makes an argument, based on a novel understanding of the term "conditional contract," that by considering the labor mix information, HUD unlawfully modified the Solicitation. Pl.'s Reply 4-8. The time to raise these objections was before the award was made. Blue & Gold, 492 F.3d at 1313.

[12]The court notes that the TET sought to use the labor mix information in its initial evaluation to understand why Pyramid's price was [***] than the prices of other bidders but concluded that "[***]" AR Tab 38, at 2154. Even though the TET lacked this information, however, the TET did not disqualify Pyramid's proposal or state to the SSO in its Source Selection Recommendation that it had found Pyramid's price [***]. See AR Tab 36, at 1447-56.

addition to their marketing fees. AR Tab 13, at 362. The Solicitation provided "not to exceed" figures for bidders to insert at the corresponding CLINs of their proposals.[13] Id. at 376. Pyramid argues that HUD "breached the evaluation criteria of the Solicitation" by including pass-through expenses when calculating each bidder's price. Pl.'s Mot. 14. However, Pyramid does not point to any language in the Solicitation that required HUD to exclude pass-through expenses when evaluating Price Proposals.[14] Rather, the Solicitation states that the government will make awards based on which proposals "represent the best overall value to the Government for all CLINs . . . ." Id. at 520 (emphasis added). Of course, "all CLINs" would contain the CLINs for the pass-through expenses.

Even if including pass-through expenses had been a violation of the terms of the Solicitation, Pyramid was not prejudiced by HUD's calculation of prices in this manner. The court is persuaded by intervenor HomeTelos's briefing on this issue, which argues that including pass-through expenses actually caused Pyramid's total price to appear closer to the prices proposed by the three successful bidders. HomeTelos Mot. 36-39. Pyramid's price was [***]. AR Tab 36, at 1456 (TET Recommendations). This gap appears less striking when pass-through expenses are included, because Pyramid and the successful bidders all included the maximum "not to exceed" amounts in their proposals. See AR Tab 45, at 4732 (HomeTelos); AR Tab 48, at 6516 (Matt Martin); AR Tab 50, at 8165 (Pemco); AR Tab 51, at 8313 (Pyramid). The pass-through expenses, by increasing the total prices each bidder proposed by the same amount, masked the disparity between the price proposed by Pyramid and the prices proposed by the successful bidders.[15]

---

[13]The annual "not to exceed" amounts were $3,425,300 for appraisal fees, $489,400 for record retention and $489,400 for post closing complaints. AR Tab 13, at 376. Over five years, they total $22,020,500.

[14]Pyramid, making the only citation to the AR it uses to support its argument that HUD was required to exclude pass-through expenses when evaluating proposals on price, claims that "[t]he Solicitation made clear that '[p]ass-Through Expenses, including Appraisal fees, expenses for Record Retention/Exit File Delivery, and expenses for Post Closing Complaints,' were reimburseable costs based on 'actual cost' and therefore were not to be evaluated as part of the offeror's prices." Pl.'s Mot. 9. It does not follow, however, that because vendors were to be reimbursed for the actual cost of their pass-through expenses, pass-through expenses were not to be included as part of the total evaluated price.

[15]The total pass-through expenses were $22,020,500. See AR Tab 13, at 376 (5 x ($3,425,300 + $489,400 + $489,400) = $22,020,500). Pyramid's price including pass-through expenses was [***] than Pemco, Ltd.'s (Pemco's) price, [***] than HomeTelos, LP's (HomeTelos's) price, and [***] than Matt Martin Real Estate Management, LLC's (Matt Martin's) price. HomeTelos Mot. 38; AR Tab 37, at 1655 (Pyramid total price: [***]); AR Tab 37, at 1636 (Pemco total price: [***]); AR Tab 37, at 1565 (HomeTelos total price: [***]); AR Tab 37, at 1612 (Matt Martin total price: [***]). Excluding pass-through expenses, Pyramid's price was fully [***]

B. HUD's Evaluation of Pyramid's Socio-Economic Status

The first and most important factor evaluated by the TET was the Socio-Economic Status of the bidder. AR Tab 13, at 516. Pyramid contends that it should have been rated "[***] ." Pl.'s Mot. 12.

As Pyramid stated in its proposal, Pyramid is a [***] business. AR Tab 51, at 8183. The Solicitation explained that proposals by multiple vendors working together under CTAs would be evaluated on the Socio-Economic factor depending on the amount of work performed by a small business. AR Tab 13, at 534-35. [***], see AR Tab 51, at 8178-8242, and the TET, noting that Pyramid is a [***] assigned it a rating of "[***]" for Socio-Economic Status. AR Tab 38, at 2139.

In Plaintiff's Motion, Pyramid argues that it should have been rated "[***]" on the Socio-Economic factor because, in its proposal, Pyramid "stated that it [***]." Pl.'s Mot. 12. However, Pyramid did not [***], but stated in briefing that it [***]. Pyramid asserts that the proportion of the work that it intended to [***] should have been considered in the evaluation of its Socio-Economic Status, improving its score. Id. Pyramid further argues that "HUD did not address the [***] at all in its evaluation of Pyramid." Id.

As this court recently noted, it must "interpret a contract as a whole and in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions." Homesource Real Estate Asset Servs., Inc. v. United States, --- Fed. Cl. ---, 2010 WL 3448193 (2010) (citing Metro. Van & Storage, Inc. v. United States, 92 Fed. Cl. 232, 263-64 (2010)); see also Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1353 (Fed. Cir. 2004) ("We must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions.") (citing Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003)). Pyramid's interpretation of the Solicitation with respect to the Socio-Economic factor does not consider the Solicitation as a whole and give reasonable meaning to all its parts.

The first sentences of the section describing how the Socio-Economic factor was to be evaluated make clear HUD's goal to increase the participation of small business as prime contractors: "Socio-Economic Status of the Vendor shall be considered as a primary evaluation factor for award with the goal of achieving one of the Agency's socio-economic goals to increase small business participation as prime contractors. HUD is committed to ensuring that [small businesses] have maximum opportunities to participate as prime contractors." AR Tab 13, at 516 (emphasis added). The rest of the paragraph explained that vendors proposing Contractor Teaming Arrangements (CTAs) should

---

than Pemco's price, [***] than HomeTelos's price, and [***] than Matt Martin's price. See Intervenor HomeTelos's Cross-Motion for Judgment on the Administrative Record, Dkt. No. 34, 36-39.

document how much of the work will be performed by small businesses and specified the score bidders would receive based on what percentage of the work small businesses would perform. Id. The description of the evaluation did not address the evaluation of the participation of small businesses as sub-contractors.[16]

The advantages of being a prime contractor are mentioned in the Solicitation. "Under GSA MAS Contractor Team Arrangements, each vendor has privity of contract with the Government since each holds its own GSA MAS contract. Each vendor can serve as the team leader and/or interact directly with the government." Id. at 399.

HUD saw CTAs as a way to for small businesses to work together or with larger businesses to submit bids as prime contractors. Section A.30 of the Solicitation, titled "Teaming to Propose a Total Solution" describes CTAs. Id. at 399. It explains that "[a] Contractor Team Arrangement allows two or more GSA Schedule vendors to work together to meet agency requirements. It permits vendors to complement each other and allows the team to compete for orders they may not qualify for independently." Id. Among the benefits Section A.30 lists are: "Allows increased small business

---

[16]Pyramid argues that "at a minimum, the Solicitation is ambiguous" as to whether the proportion of work to be completed by sub-contractors would be considered in the socio-economic analysis. By failing to assert this argument before the award was made, Pyramid has waived the ability to raise it in a post-award bid protest. See Blue & Gold, 492 F.3d at 1313.

The court notes that Pyramid did bring a pre-award protest addressing how HUD would treat subcontracting in its evaluation of the Socio-Economic factor that resulted in a settlement with HUD. See AR Tab 33. On July 31, 2009 HUD issued an amendment to the Solicitation that incorporated into the Solicitation 564 questions received from potential bidders and HUD's answers. See AR Tab 14. Pyramid's challenge resulted in the last sentence of the answer to one question, question ninety-nine, being removed from the Solicitation by amendment. AR Tab 14, at 660 (Amendment Six to the Solicitation); AR Tab 33, at 1414-15 (Letter from HUD to the United States Government Accountability Office explaining settlement). Because the protest left undisturbed the language Pyramid now contends is ambiguous, Pyramid has waived the right to challenge the language of the Solicitation in this bid protest. See Blue & Gold, 492 F.3d at 1313.

At oral argument, Pyramid argued for the first time that HUD's answer to a different question, question seventy-two, rendered the Solicitation ambiguous. Oral Argument of October 7, 2010, Argument of Mr. Murdock, 2:30:40-33:10. The time to challenge the phrasing of HUD's answer to question seventy-two was before the award was made. See Blue & Gold, 492 F.3d at 1313. The court also finds this argument, which Pyramid did not raise in its complaint or briefing, to be waived because it was untimely raised. See Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc. (Cross Med.), 424 F.3d 1293, 1320 n. 3 (Fed. Cir. 2005) (finding an issue not properly raised in an opening brief to be waived); Becton Dickinson & Co. v. C.R. Bard, Inc. (Becton Dickinson), 922 F.2d 792, 800 (Fed. Cir. 1990) ("[W]e see no reason to depart from the sound practice that an issue not raised by an appellant in its opening brief . . . is waived.").

participation," "Increases market share" and "Expands visibility." Id. Many small businesses that might otherwise serve as subcontractors might, through CTAs, be able to bid on the Solicitation as prime contractors.

By contrast with the Solicitation's focus on CTAs, at no point did the Solicitation discuss increasing the role of small businesses as subcontractors. The Solicitation explained that HUD would look up vendors on the GSA eLibrary to determine their socio-economic status. Under a CTA, a small business teaming with other businesses becomes a vendor, id. at 399, which was to be looked up. The Solicitation did not mention looking up subcontractors to see whether they were small businesses. Id. at 511.

Pyramid argues that "HUD provided no explanation or rational[e] for its faulty rating." Pl.'s Mot. 12. But, the TET was clear about its reasoning, which was quite simple and followed from the requirements of the Solicitation: [***]. AR Tab 38, at 2139. Pyramid argues that HUD's more lengthy evaluation of the socio-economic status of another bidder, [***], demonstrates that the evaluation of Pyramid was flawed. Pl.'s Mot. 12. In fact, the evaluation of [***] demonstrates the importance HUD placed on determining the amount of work that would be performed by small businesses as prime contractors.

[***], a large business, was the team leader of a CTA. AR Tab 38, at 1784. [***] claimed that its CTA partner, [***], which is a small disadvantaged business, would perform [***] of the work under the contract, which would have earned [***] a rating of "[***]." Id. Rather than accept [***] assertion of how the work would be divided, HUD examined [***] Management Work Plan to determine whether it was feasible. Id. at 1794. The TET noted that, although [***] was to perform [***] of the work, [***] planned to [***]. Id. [***] also planned [***]. Id. [***] the TET concluded. Id. [***] received a rating of "[***]" on the Socio-Economic Factor. Id. at 1784. HUD came to a similar conclusion with regard to another vendor, [***]. AR Tab 37, at 1469 ("[B]ased upon the tasks outlined for both partners in the proposal, this allocation of work is not supported and the percentages of work do not appear accurate.").

HUD's decision not to credit in full the proportion of work Pyramid's proposal stated that Pyramid planned to [***] in its socio-economic analysis was neither inconsistent with the plain language of the Solicitation nor inconsistent with HUD's treatment of other vendors.[17] The court finds that defendant's evaluation of plaintiff's proposal for the Socio-Economic factor was not arbitrary or capricious and did not lack a rational basis.

---

[17]In its final brief, Pyramid argues, without citation to authority, that HUD was obligated to explain in its discussion letter that [***] was insufficient to raise Pyramid's evaluation on the Socio-Economic Factor, because "it should have been clear to the TET team that Pyramid expected [***] to be taken into account . . . ." Pl.'s Reply 23. The court finds this argument,

C. HUD's Evaluation of Pyramid's Marketing and Sales Approach

Pyramid argues that on Factor 2: Marketing and Sales Approach, "HUD downgraded Pyramid to '[***],' with no explanation and no rational basis provided." Pl.'s Mot. 6. Specifically, Pyramid alleges that HUD misinterpreted its revised proposal as [***] Id.

The second evaluation factor related to the bidders' Marketing and Sales Approach. The TET initially rated Pyramid's proposal "[***]," also rating it "[***]" for Factor 2.1: Usage of Local Real Estate Professionals. AR Tab 38, at 2139. Addressing Factor 2.1, the TET's discussion letter to Pyramid stated that [***] to perform the final required inspection of each property sold [***] and did not meet the requirements of the Solicitation. AR Tab 22, at 929.

When it reviewed Pyramid's revised proposal, the TET noted [***]. AR Tab 37, at 1651. Instead, Pyramid planned to have [***]. Id. The TET rated Pyramid's revised proposal "[***]" for Factor 2.1 and "[***]" for Marketing and Sales Approach as a whole. Id.; AR Tab 36, at 1447.

Pyramid misinterprets why its rating was lowered for this subfactor. The TET did not mention [***]. See AR Tab 37, at 1651. Nor did HUD object to Pyramid's [***]. See id. Instead, it follows from the plain language of the TET's analysis that it was concerned with using [***]. See id. This court will not substitute its judgment for HUD's on this issue. See Overton Park, 401 U.S. at 416. The evaluation of Pyramid's Marketing and Sales Approach is exactly the type of determination that requires the "special expertise of procurement officials" and calls for the "greatest deference possible to [their] determinations." Fort Carson, 71 Fed. Cl. at 586.

D. HUD's Evaluation of Pyramid's Management Work Plan

Pyramid argues that its evaluation for Factor 3: Management Work Plan was improperly reduced from "[***]" to "[***]" although none of the ratings for the underlying subfactors changed. Pl.'s Mot. 7-8. The court agrees with the government that it is more likely that the initial rating was an error, and that the TET decided to weigh the factors

---

which was not raised in Pyramid's complaint or earlier briefing, to be waived. See Cross Med., 424 F.3d at 1320 n. 3; Becton Dickinson, 922 F.2d at 800. The court also notes that HUD was not obligated to indicate every way that Pyramid's proposal could be strengthened. Acad. Facilities Mgmt. v. United States, 87 Fed. Cl. 441, 456-57 (2009) ("[A]n agency is not required to 'spoon-feed' offerors in order to have meaningful discussions.") (quoting Carahsoft Tech. Corp. v. United States, 86 Fed. Cl. 325, 343 (2009)).

differently to bring Pyramid's overall score for Factor 3 in line with the scores of other bidders who received similar scores on the subfactors. Def.'s Reply 10-13.[18]

Pemco, for instance, earned ratings of [***]. AR Tab 37, at 1632-35. Pyramid received ratings of [***] for the four subfactors. AR Tab 38, at 2147-59 (initial ratings); AR Tab 37, at 1654-55 (revised ratings). Both Pemco and Pyramid were rated "[***]" for Factor 3. AR Tab 37, at 1635 (Pemco); AR Tab 36, at 1448 (Pyramid). The court finds it reasonable that the TET would conclude that two bidders with such similar scores on the subfactors should receive the same score for the whole of Factor 3. See Advanced Data Concepts, 216 F.3d at 1058 ("[The arbitrary and capricious standard] requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.") (citing Bowman, 419 U.S. at 285).

Further, "Contracting officers are not obligated by the APA to provide written explanations for their actions." Impresa, 238 F.3d at 1337. Although the TET did not explain why it lowered its evaluation of Pyramid's Management Work Plan, it was not required to do so.

E. HUD's Technical and Best Value Evaluations

Because the court does not find that HUD lacked a rational basis for any of the factors discussed above or that it conducted its review in an arbitrary or capricious manner, it disagrees with Pyramid's conclusion that HUD's best value and technical evaluations must be set aside. See Pl.'s Mot 17-20. To prevail in a bid protest, a "protestor must show not only a significant error in the procurement process, but also that the error prejudiced [the protestor." Data Gen., 78 F.3d at 1562. Pyramid has not met this burden.

Pyramid suggests at several points in its briefing that HUD officials involved in the procurement did not act in good faith.[19] However, agency actions are entitled to a presumption of "regularity." Impresa, 238 F.3d at 1338. "[W]here as here, the protestor alleges that government procurement officials acted in bad faith, it must then prove those allegations by clear and convincing evidence." ViroMed Labs., Inc. v. United States, 87 Fed. Cl. 493, 504 (2009) (citing Am-Pro Protective Agency, Inc. v. United States, 281 F.3d

---

[18]The court also notes that in the revised evaluation, no bidder received a technical rating of "[***]" for its Management Work Plan in Area 2D or anywhere else in the nation. See AR Tab 36, at 1447-48.

[19]See, e.g., Pl.'s Reply 10 ("These actions [reducing Pyramid's rating on the second and third evaluation factors] amount to an improper effort by HUD to 'cook the books' so that Pyramid could not be picked for award."); Id. at 17 ("Either HUD never read Pyramid's proposal . . . or HUD deliberately misconstrued Pyramid's response in order to manufacture a weakness for Subfactor 2, and use that manufactured weakness as a reason to downgrade Pyramid from [***] for this subfactor.").

1234, 1239-40 (Fed. Cir. 2002). Pyramid presents no evidence that HUD officials acted in bad faith. Pyramid's allegations, because they are not supported by clear and convincing evidence, are insufficient to overcome the "longstanding presumption that government officials act in good faith and in the public interest when carrying out their duties." Id. (quoting Carahsoft Tech. Corp. v. United States, 86 Fed. Cl. 325, 337 (2009)).

F. Injunctive Relief

To obtain a preliminary injunction, a plaintiff must establish: (1) the likelihood of the plaintiff's success on the merits of its complaint; (2) whether the plaintiff will suffer irreparable harm if the procurement is not enjoined; (3) whether the balance of hardships tips in the plaintiff's favor; and (4) whether a preliminary injunction will be contrary to the public interest. ES-KO, Inc. v. United States, 44 Fed. Cl. 429, 432 (1999) (citing FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993)). To obtain a permanent injunction a plaintiff must succeed on the merits and demonstrate: "(1) that it will suffer irreparable harm if injunctive relief is not awarded; (2) that granting the relief serves the public interest; and (3) that the harm to be suffered by it outweighs the harm to the Government and third parties." United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. 312, 323 (1998) (citing FMC Corp., 3 F.3d at 427); see Acumed LLC v. Stryker Corp., 551 F.3d 1323, 1327 (Fed. Cir. 2008); ATA Defense Indus., Inc. v. United States, 38 Fed. Cl. 489, 505 n.10 (1997) ("[the] factors are the same as those considered for a preliminary injunction").

Because the court has determined that Pyramid has not succeeded on the merits of its complaint, it finds that a neither a preliminary injunction nor a permanent injunction is appropriate.

IV. Conclusion

For the foregoing reasons, the court DENIES Pyramid's Motion, GRANTS the government's motion, GRANTS HomeTelos's Motion and GRANTS Matt Martin's Motion. The Clerk of Court is directed to ENTER JUDGMENT in favor of defendant. No costs.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Chief Judge